GARCIA RAINEY BLANK & BOWERBANK LLP
   A Limited Liability Partnership
JEFFREY M. BLANK, Cal. Bar No. 217522
jblank@garciarainey.com
NORMA V. GARCIA, Cal Bar No. 223512
ngarciaguillen@garciarainey.com
HUGO A. LOPEZ Cal Bar No. 315846
hlopez@garciarainey.com

695 Town Center Drive, Suite 700
Costa Mesa, California  92626-1925
Telephone:   714-382-7000
Facsimile:    714-784-0031
Attorneys for Plaintiff
Brian Bruce

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| BRIAN BRUCE, an individual, | Case No. |
| Plaintiff, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:** |
| v. | |
| 3M Company, a Minnesota Corporation, and Aearo Technologies, LLC; and DOES 1-10. | (1) **STRICT PRODUCTS LIABILITY – FAILURE TO WARN;** |
| Defendants. | (2) **STRICT PRODUCTS LIABILITY – DESIGN DEFECT;** |
| | (3) **NEGLIGENCE;** |
| | **DEMAND FOR JURY TRIAL** |

This action arises out of the negligence and failure to warn of or disclose critical defects in products made by Defendants 3M Company and Aearo Technologies, LLC ("Defendants"). Plaintiff Brian Bruce ("Plaintiff") used defendants dual-ended Combat Arms™ Earplugs Version 2 (the "Earplugs," "CAEV2" or "CAEV2 earplugs") during the course of Plaintiff's military service, and as a result Plaintiff now suffers from hearing loss and tinnitus. Defendants knew

of the defects of the Earplugs, and intentionally misrepresented and/or concealed such defects by, among other things, falsifying test results so as to qualify for a multi-million dollar per-year contract with the United States Federal Government.

## THE PARTIES

1.     Plaintiff Brian Bruce is a citizen of the State of California. He joined the United States Marine Corps on December 13, 2004 and was honorably discharged on December 12, 2008. Over the course of his military career, Plaintiff ascended from the rank of private to the rank of corporal. Before joining the United States Marine Corps, Plaintiff Bruce had no signs nor symptoms of hearing loss or tinnitus.

2.     Plaintiff was issued a pair of standard-issue CAEV2 in 2004 during boot camp in preparation for deployment to Iraq. Plaintiff continued to wear the CAEV2 throughout the remainder of his service.

3.     Over the course of his military career, both in training and combat roles, Plaintiff was exposed to loud impulse noises and explosions while at the firing range, during detonations of explosive devices, mortar, rocket, and missile attacks, in combat, and on convoys.

4.     Plaintiff wore the CAEV2 while conducting his duties in Iraq and in the United States.

5.     Plaintiff Brian Bruce was never instructed to fold back the third flange on the opposite side of the CAEV2 earplugs.

-2-

COMPLAINT

6.     In 2010, Plaintiff was diagnosed with tinnitus. Plaintiff's hearing and aural function has continued to deteriorate.

7.     Defendant 3M is a Delaware Corporation with its principal place of business in Minnesota.

8.     Defendant Aearo Technologies, LLC is a limited liability company formed in Delaware with its principal place of business in Minnesota.

**<u>NATURE AND BASIS OF THE ACTION</u>**

9.     This action seeks remedy for strict products liability under the common law, as well as negligence under the common law.

**<u>JURISDICTION AND VENUE</u>**

10.     Under 28 U.S.C. § 1332(a)(1), this Court has subject matter jurisdiction because there is complete diversity between Plaintiffs & Defendants and the amount in controversy for Plaintiff's claim exceeds $75,001 exclusive of costs and interest. Additionally, the Court has personal jurisdiction over Defendants because they each have a registered agent for service of process in California and therefore consented to be sued in California. Both Defendants also have sufficient contacts with California because they do business in and through California.

11.     Venue is properly laid in this Court under 28 U.S.C. § 1391 (b)(2) because a substantial part of the events giving rise to the claim occurred in California; Plaintiff was issued the CAEV2 during training in California, was exposed to loud impulse noises and weapon discharge while stationed in California, and because Plaintiff's hearing loss has continued to deteriorate in California.

COMPLAINT

12.     Venue is also proper within this District because Defendants have marketed, sold, or otherwise disseminated CAEV2 within this District and Plaintiff lives in this District.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

A.     Aero Technologies and 3M

13.     Aearo Technologies, LLC ("Aearo") was a market leader in optic and aural protection based in Indianapolis, Indiana. Before being acquired by 3M in 2008 for 1.2 billion dollars, Aearo Technologies, LLC developed, tested, marketed and sold the CAEV2. After acquisition by 3M, Aearo employees were retained and maintained within 3M a separate operating unit; additionally, Aearo's acquisition by 3M caused the CAEV2 to be marketed as a 3M product after the acquisition. As a result of 3M acquiring and assuming the assets and liabilities of Aearo, Aearo and 3M are used interchangeably and all allegations against Aearo are directed, as a matter of law, against 3M as well.

14.     The CAEV2 were developed by Aearo as non-linear, dual-ended, selective attenuation earplugs for the purpose of providing military servicemembers with two different modes of hearing attenuation depending on the manner of use of the CAEV2.

15.     CAEV2 may be worn in an open or "unblocked" position (yellow end in) to block, and/or significantly reduce loud impulse sounds common with military training and combat while still allowing the wearer to hear verbal commands and approaching enemy soldiers. The earplugs were also intended to be

-4-

COMPLAINT

worn in a "blocked" or closed position with the dark green end inserted into the ear. This position was intended to block or significantly reduce all sounds.

16.     Based on the qualities and design of the CAEV2, Defendants won a series of contracts between 2003 and 2012 with the United States Department of Defense ("DoD") to produce the CAEV2 for the DoD on a continuing, indefinite basis. Such contracts are hereinafter referred to as "IQCs."

17.     In order to win these IQCs, Defendants represented that the CAEV2 would meet the performance criteria established by the DoD. Meeting such specific performance criteria was a prerequisite for bidding on the IQCs.

18.     At all relevant times, Defendants' performance representations with regard to these criteria were false. Defendants knew them to be false. Indeed, Defendants knew that the CAEV2 were defective and did not work in the intended manner as early as the year 2000, well before bidding on the IQCs commenced.

19.     At all relevant times, the CAEV2 had a fatal design defect which caused the CAEV2 to loosen in the wearer's ear, allowing damaging sounds to enter the ear unimpeded. Specifically, the center-most and largest flange of the non-inserted end of the CAEV2 would press against the wearer's ear canal and fold back to its regular shape, loosening the seal of the inserted end. Due to the symmetry of the earplugs, this defect occurred regardless of whether the blocked or unblocked end of the CAEV2 was inserted.

20.     Defendant Aearo, LLC learned of this defect when it completed testing of the CAEV2. After the CAEV2 first failed its specification testing in

1  February of 2000, Aearo employees proceeded to roll back the non-inserted flanges

2  to mitigate the loosening effect of this defect.

3

4      21.    The performance of earplugs has been standardized under federal

5  law via the Noise Reduction Rating ("NRR") system. This system governs the

6  effectiveness of earplugs pursuant to the Noise Control Act, 42 U.S.C. §4901 *et seq.*

7  Specifically, C.F.R §211.206-1 states, in relevant part:

8

9          The value of sound attenuation to be used in the calculation of the

10         Noise Reduction Rating must be determined according to the "Method

11         for the Measurement of Real-Ear Protection of Hearing Protectors and

12         Physical Attenuation of Earmuffs." This standard is approved as the

13         American National Standards Institute Standard (ANSI-STD) S3.19-

14         1974.

15

16     22.    Further, 40 C.F.R. §211.204-4(e) requires that supporting

17  information must accompany hearing protection devices such as earplugs which are

18  sold in the United States of America:

19

20         The following minimum supporting information must accompany the

21         device in a manner which insures its availability to the prospective user.

22         In the case of bulk packaging and dispending, such supporting

23         information must be affixed to the bulk container or dispenser in the

24         same manner as the label, and in a readily visible location…instructions

25         as to the proper insertion or placement of the device.

26

27     A. **Aearo, LLC's Test Results for the CAEV2 Were Deliberately**

28         **Falsified**

23.     An earplug's NRR is intended to represent the amount of sound attenuation experienced by a test group under conditions specified by the Noise Control Act's testing methodology.

24.     In addition, the DoD may only purchase earplugs that meet the testing standards of the U.S. Army Public Health Command, Army Hearing Program, and/or equivalent standards that may be established by other branches of the military or the DoD. All such standards are tied to the NRR achieved under EPA regulations.

25.     Aearo began NRR testing of the CAEV2 on or around January 2000. Aearo performed this testing in-house at its E-A-RCAL lab rather than using an independent testing lab. Aearo's test protocol tested the subject's hearing in three ways: without an earplug, then using the open, unblocked, yellow end of the CAEV2, and lastly using the closed, blocked, green end of the CAEV2.

26.     Aearo's own employees monitored the results of the testing as it was being performed, allowing them to stop testing at any point if the results were not to their liking. This was and is a violation of the ANSI S3.19.1974 testing protocol. Indeed, Aearo employees chose to stop testing the usage of the green/blocked end of the CAEV2 after the earplug was consistently failing to achieve its desired NRR. Only 8 of 10 test subjects had been tested.

27.     Aearo expected the CAEV2 to achieve an NRR of 22, but in fact results showed that the CAEV2 was, based on the experience of the 8 subjects tested, only receiving an NRR of 10.9 when tested with the "blocked" or green end in the subject's ear. Such failure was caused by the design defect alleged above.

28.     Despite prematurely ending the testing of the green end of the CAEV2, Aearo nevertheless chose to press on. Aearo directed the remaining two test subjects to complete the test with the yellow, unblocked end of the CAEV2 inserted. The results of this test indicated that the yellow end of the CAEV2 yielded and NRR of -2, suggesting that this configuration of the CAEV2 actually *amplified* sound. Rather than retest using different or properly calibrated equipment, Aearo simply concluded that the rating of the yellow end was 0 NRR, and used that rating on its labels.

29.     What little investigation Aearo did about this evident problem resulted in the discovery of the defect mentioned above, namely, that the CAEV2 was too short and thus difficult to insert deep enough to obtain a proper fit. Thus, the CAEV2 was unable to, and Aearo was aware that the CAEV2 was unable to, obtain a proper fit in the ear canal as required by ANSI S3.19-1974, Section 3.2.3.

30.     Aearo also discovered another defect in the CAEV2. As noted above, when inserted pursuant to the standard instructions, the CAEV2's uninserted flanges would push against the ear, causing the CAEV2 to loosen. Due to the CAEV2's symmetrical nature, this problem occurred no matter which end was inserted.

31.     In order to get around this defect, Aearo manipulated testing protocol by instructing test subjects to fold the third flange of the non-inserted end outward before inserting the intended, non-folded end. Aearo did this as a stopgap, inadequate work around of the CAEV2's design defects.

32.     Using this defect workaround, Aearo conducted additional testing of the CAEV2 on or around February 2000. During this manipulated re-test, the green/blocked end of the CAEV2 achieved an NRR of 22.

33.     Aearo did not, however, do a manipulated re-test of the CAEV2 with the yellow/unblocked end in the subject's ear. Due to the symmetrical nature of the CAEV2, a manipulated re-test of the yellow/unblocked end would have almost certainly resulted in an NRR higher than the obviously incorrect -2. However, Aearo, knowing that the purported "0 NRR" of the CAEV2's yellow/unblocked end was a major selling point to the DoD, chose not to do any kind of re-test. Rather Aearo continued to represent to the DoD that using the yellow/unblocked end of the CAEV2 had an NRR of 0 and would thus not impair communication.

34.     Notably, the defect in the CAEV2 which resulted in the CAEV2 being loosened by the uninserted flanges is more likely to manifest itself in battlefield or training activities than it is in testing environments in which the subject is virtually motionless and wearing the earplug for a short amount of time. Despite knowing that the CAEV2 was highly likely to loosen in a wearer's ear during real-world use, Aearo chose not to inform the DoD about the problem.

35.     Due to the CAEV2's defects being imperceptible to the wearer, the CAEV2's defects and Defendants' negligence and misrepresentations about same went unnoticed by the DoD and the wearers of the CAEV2 for a period in excess of ten years. During this period, the United States was waging wars in Iraq and Afghanistan, in addition to its standard peacetime training and readiness exercises around the globe.

COMPLAINT

36.     Given the design defects of the CAEV2 and the exposure to loud noises inherent in military service, it is unsurprising that hearing loss problems affect in excess of 800,000 military veterans such as Plaintiff, and that the DoD spends in excess of $1 billion each year to treat hearing loss in veterans such as Plaintiff.[1]

**B. Defendant's Misrepresentations and False Certifications to the Department of Defense**

37.     On or about 2003, Aearo submitted a bid in response to the DoD's Request for Proposal for military earplugs. This Request for Proposal (RFP) required all bidders to certify that the earplugs they were bidding to make complied with the Salient Characteristics of Medical Procurement Item Description ("MPID") of Solicitation No. SP0200-06-R-4202.

38.     In its bid, Aearo certified that the CAEV2 complied with the Salient Characteristics of MPID, even though this certification was false and Aearo knew that certification to be false.

39.     Specifically, the Salient Characteristics of MPID in the RFP, in relevant part, provide:

2.1.1   Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.

---

[1] See Exhibit A *infra*.

2.2.2  The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19….

2.4    <u>Workmanship</u>. The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.

2.5.    <u>Instructions</u>. Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit…[2]

40.    Aearo knew, or should have known, that its test protocol did not comply with ANSI S3.19. Nevertheless, Aearo certified that its testing was fully compliant with the DoD's specifications. This representation was false at the time it was made, and Defendants knew it to be false at the time it was made.

41.    Additionally, Aearo falsely certified that it provided or would provide accurate "instructions explaining the proper use and handling of the ear plugs." Aearo knew that its own testing had revealed a design defect in the CAEV2 that required modified fitting instructions be provided to the wearer of the CAEV2 in order for the CAEV2 to even begin to approach its advertised NRR. Aearo knew or should have known that its certification to provide accurate fitting instructions was in fact false.

42.    Notably, at no time, even after winning the bid and entering into IQCs with the DoD, did Defendants provide accurate fitting instructions to the DoD.

43.    Section 2.4 of the Salient Characteristics of MPID provide that Aearo was required to certify that the earplugs would be free of "all defects that detract from their appearance or impair their serviceability." Despite Aearo knowing

---

[2] See Exhibit B *infra.*

since at least 2000 that the CAEV2 earplugs suffered from a design defect, Aearo certified to the DoD that the CAEV2 had no such defects.

44.     Because Aearo did not disclose to the DoD the modified fitting instructions with which it achieved a 22 NRR rating for the green/blocked end of the CAEV2, Aearo falsely overstated the amount of hearing protection the CAEV2 provided while in closed/blocked orientation.

45.     Moreover, because Aearo never tested the yellow/unblocked CAEV2 with its modified fitting instructions and because the original test of the yellow/unblocked end of the CAEV2 yielded obviously inaccurate test results, all of Aearo's representations about the NRR of the yellow/unblocked end of the CAEV2 were factually inaccurate.

46.     Based on Aearo's false representations to the DoD, its bid prevailed. Aearo entered into the first of several IQCs with the DoD later that year, making it the exclusive provider of selective attenuation earplugs to the DoD and thus the United States Military.

47.     In response to additional RFPs which the DoD disseminated in subsequent years. Defendants re-certified that the CAEV2 earplugs met the DoD's MPID criteria, even though Defendants knew or should have known that to be false.

48.     In the years from 2003 to 2015, the DoD purchased enough units of the CAEV2 to provide one pair to every serviceman deployed each year in major foreign engagements during those years.[3]

49.     On or about late 2015, Defendants discontinued the CAEV2 and ceased selling them to the DoD. At no time prior to 2015 did Defendants recall the CAEV2, despite knowing that they harbored a catastrophic design defect.

50.     Defendants' misrepresentations about the benefits and protections provided by the CAEV2, as well as their decision not to correct these misrepresentations, caused Plaintiff to suffer hearing loss and tinnitus.

51.     At all times following its acquisition of Aearo, 3M knew of, conspired with, and was complicit in Aearo's wrongful acts in marketing and selling the CAEV2 without disclosing the defects of the CAEV2 nor its modified fitting instructions.

**C. Plaintiff's Hearing Loss**

52.     On or about August 9, 2010, Plaintiff Brian Bruce underwent an audiological evaluation in Long Beach, California.

53.     During the course of this audiological evaluation (hereinafter, the "Evaluation") Plaintiff reported hearing loss and tinnitus as a result of his exposure to loud noises during the course of his military service.

_____

[3] See Exhibit C *infra.*

54.     Over the course of the Evaluation, Plaintiff's hearing was found to be "functionally impaired." Plaintiff exhibited symptoms of hearing loss and tinnitus, and was at or below 70% of maximum hearing function for dichotic digits testing, pitch pattern sequence testing, and compressed speech with reverberation testing.

55.     The results of the Evaulation also showed that Plaintiff experienced "moderate difficulty" distinguishing words from noise and that Plaintiff's hearing loss was enough to effect his quality of life.

56.     Plaintiff is informed and believes that Plaintiff's hearing loss incurred over the course of military service is due to Plaintiff's use of the defective CAEV2 when Plaintiff was exposed to loud noises typical of military service. At the time of Plaintiff's military service, Plaintiff believed the CAEV2 to be effective at noise attenuation, and on that basis used the CAEV2 when exposed to loud impulse noises.

## **TOLLING OF THE STATUTES OF LIMITATIONS**

57.     Under the Servicemembers Civil Relief Act, 50 U.S.C. § 396, the periods of Plaintiff's military service may not be included in computing any statute of limitations applicable herein.

58.     Plaintiff could not, by exercise of reasonable diligence, have discovered Defendants' wrongful acts as the cause of his injuries at an earlier time because, at the time of Plaintiff's injuries, the cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the cause his

injuries of nor the tortious nature of the conduct which caused his injuries, until less than the applicable limitations period prior to the filing of this action.

59.     Moreover, the running of the statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Through both their affirmative misrepresentations and their omissions, Defendants actively concealed from Plaintiff the risks associated with the defects of the CAEV2.

60.     Thus, as a result of the actions of Defendants, Plaintiff did not know and could not reasonably know or have learned through reasonable diligence that Plaintiff had been exposed to the defects and risks alleged herein and that those risks and defects were the direct and proximate result of the acts and omissions of Defendants.

61.     Through the affirmative misrepresentations and omissions of Defendants pertaining to the safety and efficacy of the CAEV2, Plaintiffs were prevented from discovering the information relating to the defects of the CAEV2 sooner.

## COUNT I: STRICT PRODUCTS LIABILITY – DESIGN DEFECT

62.     Plaintiff incorporates by reference paragraphs 1 to 61 as if set fully forth herein.

63.     Defendants are and were the manufacturers and sellers of the defective CAEV2 earplugs.

-15-

64.     The defective CAEV2 earplugs which Defendants tested, manufactured, distributed, and sold were, at the time they left Defendants' control, defective and defectively designed in that the CAEV2's innermost uninserted flange caused the CAEV2 to loosen in the wearer's ear, allowing damaging sounds to enter the ear canal.

65.     The defective CAEV2 earplugs that Defendants tested, manufactured, distributed and sold were, at the time they left Defendants' control, defective and unreasonably dangerous for their ordinary and expected use. The CAEV2 was defective and unreasonably dangerous for its intended use because it did not stop the loud, damaging noises commonly encountered in military service which, when not properly attenuated, may cause hearing loss or tinnitus.

66.     The defective CAEV2 earplugs that Defendants tested, manufactured, distributed and sold were, at the time they left Defendants' control, defective and not reasonably safe for their ordinary and expected use.

67.     Defendants knew or should have known of the defect in the CAEV2 earplugs.

68.     No reasonably prudent manufacturer would design, distribute, and sell an earplug with the knowledge that Defendants had of the CAEV2, namely that the stem of the CAEV2 was too short to seat correctly in the ears of some users; these incorrect fittings stemming from the defect would and did fail to guard against loud impulse noises, in turn causing hearing loss.

69.     The defective CAEV2 earplugs that Defendants manufactured, distributed, and sold were delivered to Plaintiff without any change in their

defective condition and were used by Plaintiffs in the manner expected and intended.

70.     Defendants owed a duty of care to Plaintiff to design, manufacture, and sell earplugs that met the specified performance criteria and were otherwise fit for use by American servicemen and women to protect them from damaging noises typical of military service. Defendants breached this duty of care.

71.     Defendants owed a duty of care to Plaintiff to design and sell earplugs fit for use in military service and that performed according to the specifications Defendants certified the CAEV2 could meet. Defendants breached this duty.

72.     Defendants owed a duty of care to Plaintiff to design and sell earplugs safe when used for their intended purpose; i.e. when exposed to the loud impulse sounds typical of military service. Defendants breached this duty.

## COUNT II: STRICT PRODUCT LIABILITY – FAILURE TO WARN

73.     Plaintiff incorporates by reference paragraphs 1 to 72 as if set fully forth herein.

74.     Defendants are the manufacturers and sellers of the defective CAEV2 earplugs.

75.     The defective CAEV2 earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective. Defendants had failed to warn, failed to provide instructions, and failed to provide

an adequate label that included the modified fitting instructions necessary to block out the damaging sounds.

76.     Defendants had a duty to manufacture, design, and sell the CAEV2 with reasonable and due care for the safety and well-being of wearers, including Plaintiff. Defendants breached that duty.

77.     Defendants had a duty to provide to Plaintiff adequate warnings and instructions to prevent the risks and improper use of the CAEV2 when worn in the ordinary course of military service. Defendants breached that duty.

78.     It was foreseeable to Defendants that the CAEV2 would unreasonably dangerous if distributed without a warning regarding the risks of damage to the ear if worn with an improper fit. Additionally, it was foreseeable to Defendants that the CAEV2 would be unreasonably dangerous if distributed without instructions about folding back the innermost flange of the uninserted end of the CAEV2.

79.     Not only was such conduct foreseeable by Defendants, it was in fact foreseen by Defendants. Over the course of the CAEV2's inadequate testing, Defendants discovered both the inadequate length and unseating issues of the CAEV2.

80.     Defendants had a post-sale duty to warn of the above alleged product-related defects and risks because Defendants knew or reasonably should have known that the CAEV2 was defective, inadequate, and posed a substantial risk of harm to its users, including Plaintiff. The servicemen and servicewomen who used the CAEV2 can reasonably be assumed to be unaware of the risk of harm

caused by the above-alleged defects because such defects were imperceptible. Accompanying instructions or warnings with each pair of CAEV2 could have been effectively communicated to and acted upon by the DoD and affected servicemen and women. The risk of harm to the users of the CAEV2 was sufficiently great to justify the burden on Defendants of providing warning or instruction.

81.     Defendants breached their duty of care by failing to provide a post-sale warning or instruction.

82.     Each set of CAEV2 carried with it no warnings or inadequate warnings and/or no instructions or inadequate instructions as to the defects or failure modes of the CAEV2 which would allow damaging sounds to bypass the earplug. Such sounds, unattenuated by the defective CAEV2, posed a serious risk to the quality of Plaintiff's hearing, unbeknownst to Plaintiff.

83.     The warnings and instructions that accompanied the CAEV2, when or if such warnings and instructions accompanied the CAEV2 at all, failed to provide the level of information that an ordinary wearer would expect when using the CAEV2 in a manner reasonably foreseeable to Defendants.

84.     In the event that Plaintiff has received proper and/or adequate warnings as to the defects of and risks associated with the CAEV2, they would not have used them.

85.     Alternatively and/or additionally, had Plaintiffs received instruction of the modified fitting procedure used by Defendants during testing of the CAEV2, Plaintiff would have followed the modified fitting instructions in order to ensure a proper seal to prevent damaging sounds from affecting Plaintiff's

hearing. However, these modified fitting instructions were never disclosed to Plaintiff.

86.     Plaintiff suffered injury and damage to himself as a direct and proximate result of the defectiveness and Defendants' failure to warn and/or provide adequate instruction regarding the dangerous defective condition of the CAEV2 that Defendants manufactured, distributed, and sold.

## COUNT III: NEGLIGENCE

87.     Plaintiff incorporates by reference paragraphs 1 through 86 above as if set fully forth herein.

88.     Defendants, and each of them, had a duty to use their professional expertise and exercise a degree of skill and learning ordinarily used under the same or similar business by a person or entity in the same business as Defendants of designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices.

89.     Further, Defendants had a duty to comply with the certifications made to the DoD about the qualities and performance characteristics of the CAEV2. Plaintiff is among the class of persons designed to be protected by these regulations and certification standards. Plaintiff was a foreseeable plaintiff to Defendants.

90.     Defendants breached their duties by failing to exercise the required degree of care in designing, developing, testing, manufacturing, marketing and distributing hearing protection devices in a manner that ostensibly sought to provide the specified level of hearing protection.

91.     The damages suffered by Plaintiff were a result of Defendants' conduct, including, but not limited to, damage to Plaintiff's hearing.

92.     Defendants' breaches are a direct and proximate cause of the injuries and damages suffered by Plaintiff in an amount not yet fully determined, but in excess of $75,001, exclusive of costs and interest. Plaintiff is entitled to recover damages and other relief as available, at law or equity, as a direct and proximate result of Defendant's conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Brian Bruce prays for judgment against Defendants, jointly and severally, compensatory damages and appropriate equitable relief, costs, and attorneys' fees as follows:

1.     Award of monetary damages, including compensatory relief, to which Plaintiffs are respectively entitled at the time of trial in excess of $75,001;

2.     Award of pre-judgment and post-judgment interest;

3.     That Plaintiff recover the costs of this suit;

4.     That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendants; and

5.     That Plaintiff be granted such other and further relief as the Court deems just and proper.

COMPLAINT

1   DATED: March 26, 2019

2
                                    GARCIA RAINEY BLANK & BOWERBANK LLP
3

4
                          By _____/s/ Jeffrey M. Blank_____
5                                      JEFFREY M. BLANK
                                       NORMA V. GARCIA
6                                      HUGO A. LOPEZ
7                                      Attorneys for Plaintiff
                                       BRIAN BRUCE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

## <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure,
Plaintiff Brian Bruce hereby demands a trial by jury as to all claims in this litigation.

DATED: March 26, 2019

GARCIA RAINEY BLANK & BOWERBANK LLP

By      <u>      /s/ Jeffrey M. Blank      </u>
               JEFFREY M. BLANK
               NORMA V. GARCIA
               HUGO A. LOPEZ
               Attorneys for Plaintiff
               BRIAN BRUCE

COMPLAINT